**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **FIFE M. WHITESIDE,** | * | |
| **Trustee in Bankruptcy,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION FILE NO.:** |
| | * | _____ |
| | * | |
| **GEICO Indemnity Company** | * | |
| **("GEICO"),** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| _____ | * | |

## COMPLAINT

COMES NOW Plaintiff Fife Whiteside, Trustee in Bankruptcy, on behalf of Bonnie Winslett, and respectfully shows the Court the following facts:

## INTRODUCTION

This action is based on conduct of Defendant, GEICO Indemnity Company ("GEICO" or "Defendant"), in relation to its insured, Bonnie Winslett ("Bonnie"). Bonnie suffered damage as a result of GEICO's negligent and bad faith handling of and failure to settle a claim for damages against Bonnie following a February 2012 collision for which Bonnie was indisputably at fault.

Specifically, on February 26, 2012, Bonnie was operating a vehicle covered by a GEICO automobile insurance policy when she hit Terry Guthrie ("Terry") while he was riding a bicycle. There is no dispute that Bonnie was solely at fault for the collision. Shortly thereafter, Bonnie received a letter from GEICO, dated March 5, 2012, in which it stated that GEICO was responsible and would unequivocally accept liability for the resulting damages. GEICO further informed Bonnie in this letter that GEICO would be handling the matter directly with attorney

1

Charles Gower.

As a result of the collision, Terry sustained severe and extensive physical injuries.  While Terry received immediate medical treatment at The Emergency Room, where he quickly accumulated approximately $10,000.00 in medical bills, Terry had no medical insurance and no money; therefore, Terry was unable to obtain the follow up medical care and treatment he needed for his injuries.

Without the financial means to obtain further medical care, Terry continued to suffer from his injuries caused by the collision.  On May 15, 2012, Terry's attorney sent GEICO a 30-day time limited demand providing GEICO the opportunity to settle Terry's bodily injury claim against its insured for the $30,000.00 policy limits.  GEICO immediately and unreasonably rejected the settlement offer and countered with an offer of just $12,409.00, despite having authority to offer Terry as much as $15,909.00 to settle the claim. Bonnie was never informed of either the demand for the policy limits or GEICO's rejection of the settlement offer.  GEICO knew that Terry was represented by counsel and that the contingent fee in similar personal injury cases is generally one-third.  GEICO therefore also knew that its $12,409.00 offer would result in roughly $8,200.00 to satisfy approximately $10,000.00 in already accumulated medical expenses and would provide *nothing* for Terry, who still needed additional medical treatment.

Thus, GEICO knew, or should have known, that its rejection of the time limited demand for the policy limits would result in a lawsuit against its insured, Bonnie Winslett, exposing her to excess liability.  Indeed, on May 29, 2012, Terry's attorney filed a lawsuit against Bonnie in Muscogee County Superior Court.  Despite GEICO's knowledge that a lawsuit exposing its insured to excess liability would surely follow its rejection of Terry's settlement offer, GEICO thereafter failed to effectively follow-up or otherwise communicate with either its insured or

Terry's attorney.  No settlement was reached and no Answer to the Complaint was filed.  As a result, a $2,916,204.00 default judgment was entered against GEICO's insured, Bonnie Winslett.

Recognizing its obvious bad faith in exposing its insured to a more than $2.9 million judgment when it had the opportunity to settle Terry Guthrie's claim for $30,000.00, GEICO moved quickly to appoint outside fee counsel to represent Bonnie and attempt to have the default judgment set aside. However, rather than mitigating the bad faith GEICO already committed by failing to settle the Guthrie claim for the policy limits, GEICO's subsequent actions only served to compound its bad faith.

It is anticipated that in response to the instant Complaint, GEICO will argue that Bonnie's failure to notify GEICO of the underlying lawsuit rendered her policy coverage void; however, this defense lacks merit for multiple reasons.  First, Bonnie's failure to notify GEICO of the lawsuit does not remedy GEICO's preceding bad faith in unreasonably rejecting the opportunity to settle the claim for the policy limits.  If GEICO had settled the claim for the policy limits as a reasonably prudent insurer would have, the underlying lawsuit never would have been filed.  Second, following entry of the default judgment, GEICO hired outside fee counsel to defend Bonnie without first fairly and effectively notifying Bonnie that GEICO intended to provide her this representation pursuant to a reservation of rights.  Fair and effective notification to the insured of an insurer's reservation of rights is a prerequisite that *must* be met *before* the insurer refers the case to outside fee counsel in order to preserve the right to subsequently deny coverage for any reason.  In this case, GEICO knew that it failed to fairly and effectively notify Bonnie of any reservation of rights prior to GEICO assuming Bonnie's defense.  As a result, GEICO waived and is estopped from asserting any and all policy defenses, including that Bonnie's failure to notify GEICO of the underlying lawsuit voided the coverage

3

afforded her under the GEICO policy. *See N. Am. Specialty Ins. Co. v. Bull River Marina, LLC*, No. CV412-146, 2016 U.S. Dist. LEXIS 9549, *16-17 (S.D. Ga. Jan. 26, 2016) (holding that when an insurer takes control of the insured's representation without first effectively communicating to the insured that its defense is subject to a reservation of rights, the insurer is estopped from subsequently asserting a non-coverage defense); *Hoover v. Maxum Indem. Co.*, 291 Ga. 402, 406 (2012) ("A reservation of rights is not valid if it does not fairly inform the insured of the insurer's position."); *Facility Investments, LP v. Homeland Ins. Co. of NY*, 321 Ga. App. 103, 108 (2013) (quoting *Hoover*).

GEICO's bad faith in this case does not end there.  When GEICO's efforts to have the default judgment set aside failed, Fife Whiteside, on behalf of Terry Guthrie as the petitioning creditor, filed a Chapter 7 involuntary bankruptcy petition against Bonnie, seeking to collect on the judgment.  While bankruptcy would have been in Bonnie's best interest since the judgment could have been fully discharged, GEICO responded by paying almost $30,000.00 to hire additional counsel *to fight against the involuntary bankruptcy petition*. Clearly, GEICO's decision to fight the involuntary bankruptcy was not motivated by any interest to protect Bonnie, who only stood to benefit from the bankruptcy, but rather was driven entirely by GEICO's desire to protect itself from the bad faith lawsuit it knew would be forthcoming by the bankruptcy trustee if the involuntary bankruptcy proceeded.  Once again, GEICO impermissibly and in bad faith elevated its own interest above the interest of its insured.

Finally, in August 2015, when its efforts to fight the involuntary bankruptcy also failed, GEICO abandoned Bonnie altogether and informed her that GEICO would now deny liability for the collision.  As noted above, GEICO did so knowing that it had waived its right to assert any such policy defenses when it failed to effectively notify Bonnie about any such reservation of

4

rights prior to assuming her defense more than three years earlier.

In summary, GEICO unreasonably rejected the opportunity to settle a serious personal injury claim for the $30,000.00 policy limits which resulted in a lawsuit being filed and, ultimately, a $2.9 million default judgment taken against its insured.  In doing so, GEICO ignored the various duties it owes to its insured, including, but not limited to, the duty to keep its insured effectively informed, the duty to protect the interests of its insured in defending the claim, the duty to do everything within its control to effectuate settlement and to avoid taking an unreasonable risk on behalf of its insured, the duty to fairly and effectively notify its insured of any reservation of rights, and the duty to avoid placing its own interests above those of its insured.   An ordinarily prudent insurer would have accepted the offer to settle Terry Guthrie's personal injury claim for the relatively meager $30,000.00 policy limits and avoided the risk of exposing its insured to the risk of an excess judgment.  GEICO is liable to Bonnie for its bad faith failure to settle the claim and the resulting damage suffered as a result of the excess judgment against her.

## PARTIES, JURISDICTION AND VENUE

### 1.

Plaintiff, Fife M. Whiteside, is the Trustee in Bankruptcy for Bonnie Winslett.  He is authorized to bring this action on behalf of Bonnie Winslett.  Plaintiff is subject to the jurisdiction and venue of this Court.

### 2.

Defendant, GEICO Indemnity Company (hereinafter referred to as "GEICO" or "Defendant"), is a foreign corporation engaged in the business of selling insurance to the general public and to residents in Columbus, Muscogee County, Georgia.  GEICO's principal place of

business is located at 5260 Western Avenue, Chevy Chase, Maryland 20815. GEICO is a wholly owned subsidiary of Berkshire Hathaway.  Service of the Summons and Complaint may be served on GEICO's registered agent, CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Fulton County, Georgia 30361.

3.

There is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy, exclusive of interests and costs, exceeds $75,000.00.  Therefore, this Court has subject matter jurisdiction over the claims asserted herein according to 28 U.S.C. § 1332.

4.

This Court has personal jurisdiction over GEICO.

5.

Due to the substantial business contacts which GEICO has in this district and division, GEICO is deemed to reside in this district and division.  Thus, venue is proper in this district according to 28 U.S.C. § 1391(b)(1).

6.

Venue is also proper under 28 U.S.C. § 1391 (a)(2) in that a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

**STATEMENT OF FACTS**

7.

On February 26, 2012, Bonnie Winslett was operating a vehicle and was covered by an automobile insurance policy (hereinafter "policy") issued by Defendant GEICO.

8.

The policy provided bodily injury coverage with limit of Thirty Thousand Dollars ($30,000.00) per person.

9.

While Karen Griffis was the named policyholder, Bonnie was insured under the policy as the driver of Ms. Griffis' vehicle covered by the policy.

10.

The required premiums were paid, and the policy was in full force and effect on February 26, 2012.

11.

The policy provided liability insurance coverage for the driver of the insured vehicle, Bonnie Winslett, on February 26, 2012.  The policy contained an agreement to protect the insured from personal liability for claims filed as a result of an auto collision and to provide the insured with an adequate defense in any civil action filed against the insured as a result of an auto collision.

12.

On February 26, 2012, Bonnie, while operating the vehicle covered by the GEICO insurance policy, hit Terry Guthrie while he was lawfully riding a bicycle.

13.

It is undisputed that Bonnie was at fault for the February 26, 2012, collision.

14.

As a result of the February 26, 2012 collision, Terry Guthrie suffered serious and significant injury.

15.

Terry Guthrie received initial treatment at The Emergency Room for his injuries; however, Terry was unable to obtain much needed follow-up treatment and care because he did not have insurance or the money to pay for further treatment and care. (4/5/2016 Deposition of Steve Fike and Exhibits thereto, (hereinafter "Fike Depo") at 26 and Exh. 8 thereto, attached hereto as Exhibit A).

16.

On February 28, 2012, GEICO was made aware of the February 26, 2012 collision. (*Id.* at 6).

17.

By March 2, 2012, GEICO had received the police report which clearly shows that Bonnie Winslett was at fault for the collision. (*Id.* at 7, 26 and Exh. 8 thereto at "Accident Report").

18.

By March 2, 2012, GEICO determined that Bonnie was at fault for the collision and that it would accept liability on behalf of the insured and adjust the claim. (*Id.* at 22-24, 26).

19.

On March 5, 2012, GEICO sent Bonnie a letter stating, without qualification, that "We have completed our liability investigation for the above listed accident. ***Based on the evidence we have gathered, we are responsible for the accident***. Mr. Guthrie was injured in this accident and ***we will be handling this injury directly with Attorney Charles Gower***." (*Id.* at 24 and Exh. 4 thereto) (emphasis added).

20.

GEICO's March 5, 2012, letter was addressed to Bonnie where she had been living at the time in an apartment located at 506 25th Street, Apt. 6, Columbus, Georgia.

21.

Bonnie received GEICO's letter dated March 5, 2012, and understood it to mean that GEICO was handling the matter for her.

22.

Sometime following her receipt of GEICO's March 5, 2012, letter, Bonnie was asked to move out of the 506 25th Street apartment by the other tenant(s).  (11/8/12 Hearing Transcript at 31, attached hereto as Exhibit E).  Bonnie then began staying elsewhere and no longer received mail at the 506 25th Street address; however, Bonnie continued to visit the 506 25th Street apartment from time to time.

23.

On March 19, 2012, GEICO spoke with the policyholder, Ms. Karen Griffis' fiancé, Charles Meares.  (Fike Depo. at 10).

24.

During the March 19, 2012 conversation, Mr. Meares reported to GEICO that on the day of the collision Ms. Griffis was at Bonnie Winslett's home and Bonnie wanted Ms. Griffis to drive her to the store; however, Ms. Griffis fell asleep at Bonnie's house and then Bonnie took Ms. Griffis keys and drove her vehicle.  (*Id.* at 10-11).

25.

Also during this conversation, GEICO advised that once a lawyer for Terry Guthrie submitted a demand, GEICO would thereafter forward a copy of the demand letter and attempt to

settle the claim within the policy limits.  (*Id.* at 11-12).

26.

Mr. Meares spoke with GEICO a second time on March 19, 2012, during which time he asked GEICO if Ms. Griffis should file a vehicle theft claim with the police.  GEICO advised him that it would be difficult for GEICO to deny coverage based on the delay in reporting a purported theft of the vehicle to the police and also because of the fact that the policyholder, Ms. Griffis, was friends with Bonnie and at Bonnie's home at the time Bonnie drove Ms. Griffis' vehicle.  (*Id.* at 12-13).

27.

On May 2, 2012, GEICO mailed another letter to Bonnie at the 506 25th Street, Apt. 6, Columbus, Georgia 31904; however, the May 2, 2012 letter was not delivered to Bonnie and was returned to GEICO on or about May 9, 2012. (5/2/12 Letter from GEICO to Bonnie, attached hereto as Exhibit X; Fike Depo. at 13-14 and Exh. 1 thereto at entries for 5/1/12 and 5/10/12).

28.

GEICO knew Bonnie did not receive its May 2, 2012 letter as it is reflected in GEICO notes on May 10, 2012, that the May 2, 2012 letter was not delivered to Bonnie. (Fike Depo. at 14 and Exh. 1 thereto at entry for 5/10/12).[1]

29.

---

[1] In order to clarify the record, Plaintiff notes that near the end of Steve Fike's deposition, Bonnie's counsel mistakenly referred to the letters that were undelivered to Bonnie and returned to GIECO in the mail as the March 5, 2012 and May 23, 2012 letters.  (*See* Fike Depo. at 102-103).  However, as is made clear by GEICO's own activity log notes (*see* Fike Depo. Exh. 1) and the preceding deposition testimony (Fike Depo. at 13-14, 19-20), it was actually the May 2, 2012 letter and the May 23, 2012 letter that went undelivered and were returned to GEICO.  (*See* ¶¶ 27-28, *supra* and ¶¶ 36-39).  Bonnie ***did receive*** the first letter GEICO sent to her dated March 3, 2012 (Fike Depo. Exh. 4).  (*See* ¶¶ 19-21, *supra*).  The May 2, 2012, letter was inadvertently excluded from the Fike deposition exhibit list and is attached hereto as Exhibit X.

10

On May 17, 2012, GEICO received a time limited demand dated May 15, 2012 ("Demand"), on behalf of Terry Guthrie, from his attorney, Austin Gower, requesting that GEICO tender the Thirty-Thousand Dollar ($30,000.00) policy limits to settle Terry's bodily injury claims within 30 days.  (*Id.* at 15 and Exh. 8 thereto).

30.

The May 15, 2012, time limited demand made GEICO aware that Mr. Guthrie's medical bills to date totaled approximately $10,000.00.  (*Id.* at Exh. 8).

31.

The Demand also made clear that Terry needed additional medical treatment and care that he had been unable to pursue and obtain due to having no health insurance and no money to pay for continued treatment and care.  (*Id.*).

32.

The Demand also made GEICO aware that if it did not settle Mr. Guthrie's claim within the 30-day period that Bonnie Winslett would be exposed to liability beyond the policy limits. (Fike Depo. at 27 and Exh. 8 thereto).

33.

A GEICO supervisor who received the May 15, 2012 Demand made a note in GEICO's files to respond to the Demand within 10 days of receipt and to call the named insured and the insured driver, Bonnie Winslett, as well as forward copies of the demand letter to them in addition to any follow up communications until Terry Guthrie's claim was resolved.  (*Id.* at 16 and *see* Exh. 1, "Activity Log," attached thereto).

34.

However, GEICO never called Bonnie within the 30-days following receipt of Mr. Guthrie's time limited demand to inform her of Mr. Guthrie's demand to settle his Claim for the $30,000.00 policy limits.  (*See id.* at 16-19 and Exh. 1 thereto).

35.

According to GEICO's policies and procedures, GEICO is supposed to keep a written record of all communications, including telephone calls, that it makes to or receives from the insured.  (*Id.* at 18-19).

36.

GEICO sent Bonnie a letter dated May 23, 2012, and included with the letter a copy of Mr. Guthrie's demand.  (*Id.* at 19 and Exh. 9 attached thereto).

37.

GEICO mailed its May 23, 2012, letter to Bonnie using the same 506 25th Street, Apt. 6, Columbus, Georgia 31904 address that it had previously been put on notice was no longer a valid address.

38.

Like its May 2, 2012 letter to Bonnie, GEICO's May 23, 2012 letter was also not delivered to Bonnie and was returned to GEICO.  (*Id.* at 19-20 and *see* Exh. 1 attached thereto at 6/1/12 entry).

39.

GEICO knew that Bonnie did not receive its May 23, 2012 letter. (*Id.*).

40.

GEICO also sent Mr. Guthrie's attorney, Austin Gower, a letter dated May 23, 2012, in which GEICO acknowledged its receipt of the time limited Demand and informed Austin that it

would evaluate Terry Guthrie's demand and would contact Austin to discuss claim resolution. (*Id.* at 20 and Exh. 10 attached thereto).

41.

The same day, May 23, 2012, GEICO sent Mr. Guthrie's attorney, Austin Gower, a second letter in which it rejected Terry Guthrie's Demand and instead made a counteroffer to settle Terry's bodily injury claim for $12,409.00.  (*Id.* and Exh. 11 attached thereto).

42.

Despite knowing that at the time of Terry Guthrie's Demand, his medical bills totaled approximately $10,000.00, GEICO only offered Terry approximately $2,500.00 above the medical bills to settle his bodily injury claim.  (*Id.* at 21, 27).

43.

In making its offer of only $2,500.00 above Terry's medical bills, GEICO was also aware that lawyers typically charge a contingent fee to handle personal injury cases, like Terry's, of approximately one-third.  (*Id.* at 28, 30).

44.

Thus, after paying a one-third attorney's fee, GEICO's $12,409.00 offer to settle Terry's claim would have resulted in leaving just approximately $8,200 to pay approximately $10,000.00 in medical bills and leave absolutely nothing to compensate Terry Guthrie personally.  (*Id.* at 30-31).

45.

GEICO contends by rejecting Terry's Demand for the $30,000 policy limits and instead offering only to pay Terry's medical bills to date, plus $2,500.00 in exchange for a release, that it gave equal consideration to Bonnie's interests. (*Id.* at 31-33, 52).

13

46.

GEICO is unable to offer any explanation for its conclusion that it gave equal consideration to Bonnie's interests as it did GEICO's own interests beyond that is simply what GEICO did.  (*Id.* at 33).

47.

GEICO offered Mr. Guthrie only $12,409.00 to settle his bodily injury claim despite having authority to offer $15,909.00.  (*Id.* at 35-36, 51, 54).

48.

GEICO's notes state that it needed to inform Bonnie of its decision to reject Terry's time limited demand and keep her posted as to further developments thereafter.  (*Id.* at 43, 46 and *see* Exh. 1, attached thereto).

49.

However, Bonnie was never informed within the 30-day period, via phone call or other correspondence, that GEICO was rejecting Terry's Demand and only offering $12,409.00 to settle his claim.  (*Id.* at 44-45, 47).

50.

On May 29, 2012, following GEICO's rejection of his time limited demand for the policy limits, Terry Guthrie filed his Complaint for damages against Bonnie Winslett in the Superior Court of Muscogee County, Georgia, Case No. SU-12-CV-1935.  (Superior Court Complaint, attached hereto as Exhibit B).

51.

Bonnie was thereafter promptly and properly personally served with process of the underlying lawsuit on May 30, 2012, at the 506 25th Street apartment.  Luckily, the Sheriff was

able to serve Bonnie at this address as she was visiting there at the time.  (Sheriff's Entry of Service, attached hereto as Exhibit C).

52.

During the 30-day time period, besides its May 23, 2012 letters acknowledging Terry's Demand for the policy limits and then rejecting it with an offer of $12,409.00, the only other communication GEICO attempted with Terry's attorney during this time period was a June 1, 2012, voicemail following up as to its $12,409.00 counteroffer.  (Fike Depo. at 48-50).

53.

Despite knowing that GEICO had rejected Terry Guthrie's time limited Demand for the policy limits and that the claim had not otherwise settled, GEICO never attempted to initiate contact with Terry's attorney again following its June 1, 2012 voicemail.  (*Id.*).

54.

GEICO knew or should have known, that its rejection of Terry Guthrie's time limited Demand for the policy limits would result in a lawsuit against its insured, Bonnie Winslett.  (*Id.* at 27).

55.

This is particularly true when GEICO knew that it failed to otherwise settle the claim against Bonnie.

56.

However, despite this knowledge of a certain lawsuit exposing its insured to excess liability, GEICO failed to effectively follow up or communicate with either its insured or Terry Guthrie's attorney following GEICO's rejection of the time limited Demand.

57.

GEICO believes that it treated Bonnie fairly with regard to its actions related to Terry's time limited Demand and if given the opportunity again it would treat her the same way.  (*Id.* at 5-6, 52).

58.

After being served with Terry's Complaint for damages against her on May 29, 2012, Bonnie called Terry's attorney and informed his office that she did not have any money and had already served time in jail.

59.

Bonnie did not believe she needed to contact anyone else regarding the lawsuit.  Her belief was, in part, her reliance on GEICO's March 5, 2012 letter (*supra*, ¶ 19) wherein GEICO told Bonnie GEICO was accepting responsibility for the accident and resulting damages and that GEICO would be handling the matter "directly with attorney Charles Gower."

60.

On August 1, 2012, Terry obtained a default judgment against Bonnie after no Answer to the Complaint was filed.  (Default Judgment, attached hereto as Exhibit D).

61.

Sometime after she had been served with process in the Superior Court case, but prior to August 2012, Bonnie quit visiting the 506 25th Street apartment and did not return.  (11/8/12 Hearing Trans. Excerpts 30:22-31:14, attached hereto as Exhibit E).

62.

For a few sporadic days between June 2012 and December 2012, Bonnie stayed with Paul Webb, her social security benefits representative payee, at his home in Fort Mitchell,

Alabama. (Affidavit of Paul Webb, attached hereto as Exhibit F).

63.

However, during this approximate time period of June 2012 through December 2012, Bonnie was primarily residing at several locations all within Columbus, Muscogee County, Georgia—including sometimes with someone named "Mario," sometimes at various homeless shelters, and sometimes just living in the streets. (*Id.*).

64.

On August 8, 2012, Terry's attorney, Austin Gower, sent GEICO a letter advising GEICO that as a result of GEICO's failure to pay the time limited Demand for the $30,000 policy limits, a lawsuit was filed and a default judgment was taken against its insured, Bonnie Winslett, in the amount of $2,916,204.00.  (Fike Depo. at 52 and Exh. 13 attached thereto).

65.

As of August 16, 2012, GEICO never had any direct contact with its insured, Bonnie Winslett, and, other than its March 5, 2012 letter which Bonnie did receive (*see* ¶¶ 19-21, *supra*), GEICO's subsequent attempts at written correspondence with Bonnie were unsuccessful as the mail GEICO was sending to Bonnie was returned to GEICO (*see* ¶¶ 27-28, 36-39, *supra*). (Fike Depo. 53, 55 and Exh. 1 attached thereto).

66.

GEICO must have known, or should have known, that a lawsuit against its insured, Bonnie Winslett, would be filed when GEICO failed to settle Terry Guthrie's claim.

67.

On August 20, 2012, Mr. Stephen Fike, a GEICO Regional Liability Administrator, whose duty is to consult on coverage issues, became involved and recommended that GEICO

bifurcate the file and send Ms. Winslett a reservation of rights letter notifying her that GEICO may determine that she has no coverage since she did not notify GEICO of the lawsuit.  (*Id.* at 55-57).

### 68.

The insured must be notified of the potential coverage issue and GEICO's reservation of rights <u>before</u> the case can be referred to fee counsel.  (*Id.* at 57, 60).

### 69.

It is imperative to effectively notify an insured, like Bonnie Winslett, of GEICO's reservation of rights <u>before</u> referring the case to fee counsel so that the insured is aware that their assignment of legal counsel may be temporary and may be terminated if GEICO subsequently determines that there is no coverage. (*Id.* at 59-61, 97-98).

### 70.

The purpose of a reservation of rights letter is to effectively notify the insured, in this instance, Bonnie Winslett, of GEICO's position concerning coverage.  (*Id.* at 59-60, 97-98).

### 71.

The insured must be fairly and effectively notified of the reservation of rights <u>before</u> the case is referred to fee counsel so that the insured is not misled and does not have a false sense of defense or payment of a verdict.  (*Id.* at 61-62).

### 72.

If the insurer, like GEICO, fails to notify the insured of the reservation of rights <u>before</u> referring the case to fee counsel, then the insurer waives its right to deny coverage. (*Id.* at 63).

### 73.

If there is a conflict between GEICO and the insured as to coverage, the lawyer selected to represent the interest of the insured is not supposed to take sides.  (*Id.* at 64-65, 105).

74.

On August 22, 2012, GEICO mailed its reservation of rights letter to Bonnie Winslett at 506 25th Street, Apt. 6, Columbus, Georiga 31904—an address GEICO had already repeatedly been put on notice was no longer a valid address for Bonnie.  (*See* ¶¶ 27-28, 36-39, 65, *supra*; Fike Depo. Exh. 14, attached thereto).

75.

GEICO knew that Bonnie Winslett was not receiving the mail it had previously sent to this address in May 2012 and, therefore, GEICO knew, or should have known, that Bonnie would not receive the August 22, 2012 reservation of rights letter it mailed to her at this same address.  (*See* Fike Depo. at 53).

76.

On August 23, 2012, despite knowing that Bonnie had not been effectively notified of GEICO's reservation of rights because GEICO mailed its reservation of rights letter to an address GEICO knew was invalid, GEICO referred the case to outside fee counsel, Ted Theus. (*Id.* at 68; *see* ¶¶ 27-28, 36-39, 65, 74, *supra*).

77.

On August 23, 2012, GEICO faxed documents to fee counsel, Ted Theus, for purposes of his representation of Bonnie Winslett.  (*Id.* at 68 and Exh. 1, attached thereto).

78.

Mr. Theus was hired as fee counsel by GEICO to represent the interest of Bonnie Winslett. (*Id.* at 105).

19

79.

GEICO did not, and could not, rely on Mr. Theus to simultaneously assist GEICO in any way in its reservation of rights to defeat coverage because that would have resulted in a conflict of interest.  (*Id.* at 105).

80.

Bonnie Winslett did not receive a reservation of rights letter from GEICO prior to GEICO engaging Mr. Theus as fee counsel to represent Bonnie.

81.

GEICO failed to effectively notify Bonnie of its purported reservation of rights and, thus, waived its right to subsequently deny Bonnie coverage.

82.

On August 30, 2012, Ted Theus called GEICO and informed GEICO that, to date, he had been unable to locate Bonnie.  (*Id.* at 69).

83.

On September 20, 2012, Ted Theus informed GEICO that Bonnie Winslett had called him that day and told him that she had been living in a homeless shelter but had since moved to Alabama and was living with her boyfriend.  (*Id.* at 70).

84.

Ted Theus further informed GEICO that Bonnie told him that after she was served with Terry Guthrie's lawsuit, she called Terry's attorney's office, the Gower office, and told a legal assistant there that she had no money and had already served her time in jail.  (*Id.* at 70).

85.

According to Mr. Theus, after Bonnie called the Gower office, Bonnie honestly did not realize she needed to discuss the lawsuit further with anyone else, including GEICO.  (*Id.* at 71).

86.

Ted Theus advised GEICO that Bonnie Winslett had told him that she had a mental disability.  Mr. Theus further advised GEICO that he was going to meet with Bonnie the following week and that he thought he could get the default opened up by arguing that Bonnie was incompetent to accept service of the Complaint due to her purported mental disability.  (*Id.* at 70-71).

87.

No one disputes that Bonnie may be of limited intellect as she admittedly has only a 4th grade education; however, Bonnie has never been declared mentally incompetent as a matter of law.  (10/22/12 Bonnie Winslett Deposition Excerpts at 8, attached hereto as Exhibit G).

88.

On or about September 23, 2012, Mr. Theus met with Bonnie at which time he had Bonnie sign an Affidavit stating, among other things, that she suffers from multiple mental disorders, has no permanent address, and that she honestly did not know she needed to contact anyone upon being served with Terry Guthrie's lawsuit.  (Fike Depo. at 71-72 and Exh. 19, attached thereto).

89.

Indeed, the only communication Bonnie ever received from GEICO was the March 3, 2012 letter, which informed Bonnie that GEICO was accepting responsibility and that GEICO would be handling resolution of the matter directly with attorney Charles Gower.  (¶¶ 19-21, *supra*).  GEICO failed to inform Bonnie that she needed to contact GEICO in the event a lawsuit

21

was filed against her.

90.

An ordinarily prudent insurer would have informed its insured in their initial communication that if a lawsuit is filed the insured should contact the insurer immediately.  (*See e.g.*, Initial Communication letter from Encompass to Charles Gower, attached hereto as Exhibit Y and *compare with* Fike Depo. Exh. 4, 3/5/12 Letter from GEICO to Bonnie).

91.

On September 24, 2012, Mr. Theus emailed the signed Affidavit of Bonnie Winslett to GEICO.  (*Id.*).

92.

GEICO understood that Mr. Theus intended to use the Affidavit of Bonnie Winslett to try and get the default judgment against Bonnie set aside. (*Id.* at 73).

93.

On September 28, 2012, Mr. Theus filed a motion in the Muscogee County Superior Court to set aside the default judgment against Bonnie.

94.

Because a new term of court had already begun on August 6, 2012, and the motion to set aside the default judgment was filed outside the term of court in which the judgment was entered, it could only be set aside for one of the reasons enumerated under O.C.G.A. § 9-11-60(d).

95.

The motion alleged, among other things, that the judgment was voidable due to Bonnie's purported mental incompetence at the time the default judgment was entered and also blamed the

Court for failure to give proper notice of the judgment.

96.

On October 4, 2012, Mr. Theus sent a fax to GEICO in which he informed GEICO that Terry's attorney indicated that he intended to try to keep the default judgment in place and, assuming Bonnie filed bankruptcy, he would then try to get the bankruptcy trustee to appoint his office to investigate and pursue a bad faith action against GEICO based upon GEICO's failure to pay the policy limits in response to the time limited demand. (*Id.* at 74 and Exh. 21, attached thereto).

97.

Also on October 4, 2012, Mr. Theus sent GEICO an email in which he informed GEICO of a conversation he had with Terry Guthrie's attorney who again stated that, assuming the default judgment stood, he would thereafter file an involuntary bankruptcy on behalf of Terry Guthrie as a creditor of Bonnie Winslett and bring a claim against GEICO for bad faith. (*Id.* at 75 and Exh. 22 thereto).

98.

On or about November 1, 2012, GEICO hired attorney Wallace Miller to represent it against any potential bad faith claim. (*Id.* at 89).

99.

On November 30, 2012, after a hearing on the evidence, the Superior Court denied the motion to set aside the default judgment against Bonnie. (11/30/12 Order denying mot. to set aside default, attached hereto as Exhibit H).

100.

In its Order denying the motion to set aside the default judgment, the Court found that Bonnie was mentally competent, that notice of default judgment was waived upon the failure to file an Answer to the Complaint, and none of the enumerated reasons for setting aside the default judgment under O.C.G.A. § 9-11-60 existed.  (*Id.*).

101.

On December 4, 2012, there being no stay on the entry of the default judgment, a Chapter 7 Involuntary Bankruptcy Petition was filed by Fife Whiteside, on behalf of Terry Guthrie as the petitioning creditor, against Bonnie Winslett, in the United States Bankruptcy Court, Middle District of Georgia, Columbus Division, Petition No. 12-41184.  (Invol. Bankr. Pet., attached hereto as Exhibit I).

102.

On December 7, 2012, Ted Theus notified GEICO of the involuntary bankruptcy petition. (Fike Depo. at 90).

103.

On December 12, 2012, according to GEICO employee Kathy Kiser, Bonnie's bankruptcy might not be a covered item under the insurance contract.  (*Id.* at 90-91).

104.

On December 14, 2012, GEICO's home office decided that GEICO would not hire an attorney to represent Bonnie in the bankruptcy action.  (*Id.* at 91-92).

105.

On December 20, 2012, however, GEICO changed course and decided that GEICO would provide Bonnie with a bankruptcy attorney to fight the involuntary bankruptcy.  (*Id.* 92-93).

106.

GEICO hired attorney Steve Gunby to defend the involuntary bankruptcy action on behalf of Bonnie, despite the fact that the bankruptcy petition would actually be in Bonnie's best interest as the judgment against her would be fully dischargeable in bankruptcy.  (*Id.* at 94).

107.

Thus, GEICO's decision to fight the involuntary bankruptcy was made with GEICO considering its own best interest, and not the best interest of Bonnie Winslett.

108.

GEICO wanted the involuntary bankruptcy against Bonnie to fail so that it could not be sued by the bankruptcy trustee for bad faith failure to settle Terry Guthrie's bodily injury claim against Bonnie for the $30,000 policy limits.

109.

GEICO paid Steve Gunby $26,526.10 to fight the involuntary bankruptcy petition. (Gunby Rule 2016(b) Statement, attached hereto as Exhibit J).

110.

On December 27, 2012, Steve Gunby filed a response with opposition, or an Answer and Demand for Trial by Jury, to the involuntary bankruptcy petition on behalf of Bonnie, claiming, among other things, that Mr. Guthrie was not an eligible creditor and had no standing because the default judgment was on appeal.

111.

On December 28, 2012, Ted Theus, on behalf of Bonnie, filed an original Application for Discretionary Appeal with the Georgia Court of Appeals, which instituted the case *Winslett v. Guthrie*, Case No. A13-D0184 ("First Court of Appeals case"), in an attempt to appeal the

Superior Court's refusal to set aside the default judgment.

112.

On January 18, 2013, according to GEICO's notes, GEICO instructed its employee, Elvi, to resend a reservation of rights letter to Bonnie as soon as possible and to continue to resend the reservation of rights letter to Bonnie each month thereafter.  (Fike Depo. at 76 and Exh. 23, attached thereto).

113.

On January 24, 2013, the Court of Appeals issued its Order denying the Application for discretionary appeal on the grounds that it was prohibited by the automatic stay in bankruptcy created by the filing of the involuntary bankruptcy case.  (1/24/13 Order denying Application for Appeal, attached hereto as Exhibit K).

114.

On January 27, 2013, a stipulated motion for relief from stay was filed in the bankruptcy case in order to allow for a second Application for Discretionary Appeal to be filed and, if granted, for the appeal of the Superior Court's denial of the motion to set aside the default judgment to go forward.

115.

On February 5, 2013, the bankruptcy court entered a Stipulated Order approving that modification and granting the relief from stay, so as to permit the second application for discretionary appeal to be filed.

116.

On February 20, 2013, the second application for discretionary appeal was filed, which instituted the Court of Appeals case, *Winslett v. Guthrie*, Case No. A13-D0216 ("Second Court

of Appeals Case").

### 117.

In February 2013, GEICO's investigator spoke with the policyholder, Karen Griffis. Ms. Griffis told the investigator that she met Bonnie Winslett for the first time at a friend's house on February 26, 2012, when Bonnie asked Ms. Griffis to give her a ride home. (Fike Depo. 78-79 and Exh. 24, attached thereto).

### 118.

Ms. Griffis told the investigator that she gave Bonnie a ride to her home at 506 25th Street, Apt. 6, Columbus, Georgia, when Ms. Griffis entered Bonnie's apartment to use the restroom. Ms. Griffis further stated to the investigator that while she was in the restroom, Bonnie asked her through the closed door to drive her to the store. Ms. Griffis told the investigator that she told Bonnie she would drive her to the store when she was finished in the bathroom. (*Id.* at 79).

### 119.

Ms. Griffis told GEICO's investigator that when she exited the bathroom, she noticed that her keys and her car were gone. (*Id.*).

### 120.

This description of events leading up to the collision at issue as described by Ms. Griffis to GEICO's investigator in February 2013, conflicts with the description of events leading up to the wreck as reported to GEICO in March 2012 by Ms. Griffis' fiancé, Charles Meares (*see* ¶ 24, *supra*). (*Id.* at 81).

### 121.

It also conflicts with the sworn testimony of Bonnie herself, who testified during her October 22, 2012, deposition that Ms. Griffis asked Bonnie to go to the store even though Ms. Griffis knew that Bonnie did not have a driver's license. (*Id.* at 88; Winslett Depo. Excerpts at 6-7, attached hereto as Exhibit G).

122.

On March 12, 2013, the Georgia Court of Appeals granted the second Application for Discretionary Appeal in the Second Court of Appeals case to hear the appeal of the Superior Court's denial of the motion to set aside the default judgment.

123.

On March 19, 2013, the Notice of Appeal was filed in the Superior Court case.

124.

On November 26, 2013, despite the Georgia Court of Appeals not having issued a decision on the pending appeal in the Second Court of Appeals case, Bonnie's GEICO appointed bankruptcy attorney, Steve Gunby, filed a Motion to Dismiss the Involuntary Bankruptcy Petition in the bankruptcy case.

125.

At the time Mr. Gunby filed the motion to dismiss the involuntary bankruptcy petition, he was not, and had not been, in contact with Bonnie. (*See* Affidavit of Fife Whiteside and letter from Gunby, attached hereto as Exhibit L).

126.

In fact, none of Bonnie's GEICO appointed lawyers had any contact with Bonnie for more than a year from approximately November 2012 through December 2013. (*Id.*; 11/8/12 Hearing Trans. 5:14-23, attached hereto as Exhibit E; Affidavit of Ted Theus, attached hereto as

Exhibit M).

127.

On January 3, 2014, Terry Guthrie filed his response in opposition to the motion to dismiss the involuntary bankruptcy petition in the bankruptcy case. (Guthrie Opp. to Mot. Dismiss Invol. Bankr., attached hereto as Exhibit N and Exhibits thereto available at [Bankr. Pacer Doc. 30]).

128.

On January 9, 2014, the bankruptcy court entered an Order denying the motion to dismiss the involuntary bankruptcy petition pending resolution of the appeal in the Second Court of Appeals case. (1/9/14 Bankr. Ct. Order denying Mot. to Dismiss, attached hereto as Exhibit O).

129.

On January 23, 2014, Steve Gunby filed a motion with the District Court for leave to appeal the bankruptcy court's Order denying its motion to dismiss the involuntary bankruptcy petition.

130.

On March 13, 2014, the Georgia Court of Appeals affirmed the Superior Court's decision to deny the motion to set aside the default judgment against Bonnie Winslett. (3/13/14 Court of Appeals Order, attached hereto as Exhibit P).

131.

On April 2, 2014, the Georgia Court of Appeals denied a subsequent motion to reconsider its March 13, 2014 decision. (4/2/14 Court of Appeals Order, attached hereto as Exhibit Q).

132.

On April 22, 2014, Bonnie's GEICO appointed counsel filed a Petition for Certiorari to the Georgia Supreme Court, instituting the Supreme Court case, *Winslett v. Guthrie*, Case No. S14-C1144, ("Supreme Court case"), in an effort to persist in the contention that the judgment debt against Bonnie was still on appeal and, thus, disputable.

133.

On April 24, 2014, the District Court, in a text only entry on the bankruptcy docket, denied a motion for leave to appeal the bankruptcy court's denial of the motion to dismiss because it held that Mr. Gunby filed his motion without obtaining certification for an interlocutory appeal by the bankruptcy judge.

134.

On June 12, 2014, Terry Guthrie filed a motion for relief from stay in the bankruptcy court so that he could file a motion with the Superior Court to request a supersedeas bond.

135.

On July 2, 2014, the bankruptcy court ordered the automatic stay be modified to allow Terry Guthrie to request the Superior Court, in the Superior Court case, to require a supersedeas bond under O.C.G.A. § 5-6-46(a) and § 9-11-62(b).

136.

On October 6, 2014, the Georgia Supreme Court denied certiorari in the Supreme Court case.  (10/6/14 GA Supreme Ct. Order, attached hereto as Exhibit R).

137.

On October 22, 2014, the case was remitted from the Georgia Supreme Court to the Georgia Court of Appeals.

138.

On October 23, 2014, the case was remitted from the Georgia Court of Appeals to the Superior Court of Muscogee County.

139.

On November 5, 2014, the Superior Court entered an order in which it adopted the ruling of the Court of Appeals affirming the Superior Court's denial of the motion to set aside the default judgment against Bonnie.  (11/5/14 Superior Ct. Order, attached hereto as Exhibit S).

140.

On April 24, 2015, Terry Guthrie filed a motion for full or partial summary judgment in the bankruptcy case.  (Guthrie Mot. for Summ. J., attached hereto as Exhibit T and voluminous Exhibits thereto available at [Bankr. Pacer Doc. 48]).

141.

On May 22, 2015, following a hearing, the bankruptcy court granted Guthrie's motion for summary judgment and adjudicated Bonnie Winslett a Chapter 7 Debtor.  (5/22/15 Bankr. Ct. Order granting Mot. Summ. J., attached hereto as Exhibit U).

142.

Shortly thereafter, on June 9, 2015, Steve Gunby filed an application for leave to withdraw as Bonnie's attorney in the bankruptcy case.

143.

GEICO believed that since Steve Gunby had been unable to locate Bonnie, it was unlikely that the Gower office would be able to locate her either and, therefore, in GEICO's opinion, a bad faith claim against GEICO was unlikely to succeed. (Fike Depo. at 99 and *see* Exh. 1 at notes for 5/28/15, attached thereto).

144.

GEICO noted during this time that it did not even know if Bonnie was still alive.  (*Id.*).

146.

On July 22, 2015, the bankruptcy court granted Mr. Gunby's motion to withdraw as counsel for Bonnie. [Bankr. Pacer Doc. 74].

146.

On July 24, 2015, Fife Whiteside notified the bankruptcy court of his acceptance of the office of Chapter 7 Trustee in Bonnie's bankruptcy case.  [Bankr. Pacer Doc. 75].

147.

GEICO sent Bonnie a letter dated August 7, 2015, in which it informed Bonnie that GEICO was denying coverage because she did not give GEICO notice of Terry Guthrie's May 29, 2012 lawsuit.  (Fike Depo. at 81-83 and Exh. 25, attached thereto).

148.

Also, in the letter dated August 7, 2015, GEICO informed Bonnie for the first time that it was denying coverage because she allegedly was operating Ms. Griffis' car without permission. (*Id.*).

149.

Prior to August 7, 2015, GEICO had never previously alleged that there was an issue concerning whether Bonnie was a permissive driver. (*Id.* at 83-85).

150.

Indeed, none of the reservation of rights letters GEICO had previously attempted, but ultimately failed, to deliver to Bonnie asserted a non-permissive driver defense. (*Id.* at 83-86).

151.

On September 10, 2015, Bonnie's bankruptcy Trustee, Mr. Whiteside, filed a motion to employ Charles A. Gower, P.C. as attorneys to represent Bonnie's Chapter 7 estate for the special purpose of investigating and pursuing the instant bad faith case against GEICO.  (Mot. to Employ, attached hereto as Exhibit V).

152.

On September 14, 2015, the bankruptcy court granted the Trustee's motion to employ Charles A. Gower, PC, as special counsel to represent Bonnie's Chapter 7 estate for purposes of investigating and pursuing the instant bad faith case.  (9/14/15 Order, attached hereto as Exhibit W).

### LIABILITY OF DEFENDANT

### COUNT I—NEGLIGENCE AND BAD FAITH

153.

Plaintiff incorporates by reference the allegations of Paragraphs 1 through 152 as if fully set forth herein.

154.

Under all the circumstances of the case, the Guthrie Claim could have been settled by GEICO and should have been settled by GEICO had it acted with ordinary care and good faith, and given equal consideration to the financial interests of its insured, Bonnie Winslett.

155.

Nonetheless, the Guthrie Claim was not settled and, as a result, Terry Guthrie filed a lawsuit seeking a judgment against Bonnie Winslett.  Subsequently, a default judgment was entered in favor of Terry Guthrie in the amount of $2,916,204.00.

156.

As a result of the liability policy issued by GEICO, and because of the relationships of the parties to that contract, GEICO owed its insured, Bonnie Winslett, a duty to use ordinary care and good faith in the handling of the Guthrie Claim.

157.

This duty owed by GEICO to its insured included but was not limited to the following obligations:

(a) To give equal consideration to the financial interests of its insured;

(b) To protect the interests of the insured in defending against the claims of persons injured by the insured;

(c) To act reasonably and use that degree of care which is exercised by an ordinarily prudent insurer under the same or similar circumstances;

(d) To do what it can to effectuate the settlement of claims against its insured;

(e) To settle a claim against the insured if an ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk;

(f) To refrain from taking an unreasonable risk on behalf of its insured;

(g) To attempt in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;

(h) To adopt and implement procedures for the prompt investigation and settlement of claims arising under its policies;

(i) To properly represent to claimants and insureds relevant facts or policy provisions related to coverages at issue;

(j) To inform its insured of all settlement opportunities and overtures;

(k) To effectively notify its insured if it is providing representation pursuant to any

reservation of rights prior to referring the case to outside fee counsel; and

(l)  To handle the entire claim in accordance with applicable laws, statutes, governmental and industry regulations that establish the obligations and standard of conduct for liability insurance companies handling claims, as well as GEICO's own policies.

158.

GEICO breached its duties to its insured in the handling of the Guthrie Claim by:

(a)  Failing to handle the Guthrie Claim with ordinary care, in good faith, and with equal consideration for the interests of its insured;

(b)  Placing its financial interests superior to the interests of its insured in the handling of the Guthrie Claim;

(c)  Failing to settle the Guthrie Claim where the insured's liability was clear, the damages were in excess of the available policy limits and when it was on notice that it had an opportunity to settle the case;

(d)  Failing to settle the Guthrie Claim against its insured when it could have and should have done so, had it given equal consideration to the interests of its insured;

(e)  Failing to inform the insured of all settlement opportunities and overtures;

(f)  Negligently and carelessly adjusting and defending the Guthrie Claim;

(g)  Failing to protect the interests of the insured in defending against the Guthrie Claim;

(h)  Failing to act reasonably and use that degree of care which is exercised by an ordinarily prudent insurer under the same or similar circumstances;

(i)  Failing to do what it could to effectuate the settlement of the Guthrie Claim against its insured;

(j)  Failing to settle the Guthrie Claim against the insured when an ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk to its insured;

(k)  Failing to refrain from taking an unreasonable risk on behalf of its insured;

(l)  Failing to attempt in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability had become reasonably clear;

(m) Failing to adopt and implement procedures for the prompt investigation and settlement of claims such as the Guthrie Claim;

(n)  Failing to properly represent to claimants and insureds relevant facts or policy provisions relating to coverages at issue;

(o)  Failing to effectively notify its insured of any reservation of rights prior to referring the case to outside fee counsel;

(p)  Failing to handle the entire claim in accordance with applicable laws, statutes, governmental and industry regulations that establish the obligations and standard of conduct for liability insurance companies handling claims, as well as GEICO's own policies.

159.

As a proximate result of these breaches by GEICO, the Guthrie Claim did not settle within the policy limits, and instead a lawsuit was filed against Bonnie Winslett, who became personally liable to Terry Guthrie in the amount of $2,916,204.00.

160.

GEICO negligently or in bad faith failed to settle the Guthrie Claim within the policy limits, resulting in a judgment against its insured, Bonnie Winslett, in excess of the policy limits.

161.

As a result of the breaches of duties to its insured and bad faith, GEICO is liable for the full amount of the Judgment plus interest and other damages.

162.

Plaintiff claims special damages in the amount of the Judgment, plus interest at the legal rate, and special and general damages in an amount to be determined by the enlightened conscience of a jury at trial for the foreseeable harm resulting from GEICO's actions.

## COUNT II—ATTORNEYS' FEES AND LITIGATION EXPENSES

163.

Plaintiff incorporates by reference all allegations of Paragraphs 1 through 162 as if fully set forth herein.

164.

GEICO acted in bad faith in the underlying transaction, has been stubbornly litigious and has caused the Plaintiff unnecessary trouble and expense, which makes Defendant liable under O.C.G.A. § 13-6-11 for attorneys' fees and litigation expenses.

## COUNT III—PUNITIVE DAMAGES

165.

Plaintiff incorporates by reference the allegations of Paragraphs 1 through 164 as if fully set forth herein.

166.

The actions of Defendant GEICO were done intentionally, maliciously and with a conscious disregard of the rights of its insured, knowing there was a substantial certainty of financial harm to result to its insured from GEICO's own actions.  Based on those actions,

Defendant is liable for punitive damages to punish and deter the Defendant from repeating such conduct pursuant to O.C.G.A. § 51-12-5.1.

WHEREFORE, Plaintiff prays for and demands the following:

(a) That Plaintiff recover from the Defendant the aforementioned judgment in the amount of $2,916,204.00, interest on the judgment, and other consequential damages caused by Defendant's actions;

(b) That Plaintiff recover from Defendant attorneys' fees, costs and expenses of litigation;

(c) That the issues be tried to a jury;

(d) That Plaintiff recover all damages flowing from the bad faith, breach of fiduciary duty, including the judgment, post-judgment interest, attorneys' fees and costs;

(e) That punitive and exemplary damages be assessed against Defendant in an amount to be determined by the enlightened conscience of a fair and impartial jury; and

(f) That the Court grant such other and further relief as it may deem necessary.


Respectfully submitted, this 12th day of September, 2016.

CHARLES A. GOWER, P.C.

/s/ *Charles A. Gower*
Charles. A. Gower
Georgia Bar No. 303500
Miranda J. Brash
Georgia Bar No. 475203

*Attorneys for Plaintiffs*

1425 Wynnton Road
P. O. Box 5509
Columbus, GA  31906
(706)324-5685